**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**BRAVIA CAPITAL HONG KONG LIMITED,**

                    **Plaintiff,**

            **- against -**

**SL GREEN REALTY CORPORATION, ET AL.,**

                    **Defendants.**
————————————————————————

**24-cv-2296 (JGK)**

**MEMORANDUM OPINION AND**
**ORDER**

**JOHN G. KOELTL, District Judge:**

The plaintiff, Bravia Capital Hong Kong Limited ("Bravia") obtained a New York State Supreme Court judgment totaling $12,986,660.70 against Palisades Member 2 LLC ("PM2"). But while Bravia's action against PM2 was pending in state court, PM2's direct subsidiary, Palisades Training Center NY LLC ("PTC"), transferred PTC's principal asset—the Palisades Premier Conference Center (the "PPC Center")—to Palisades Fee Owner LLC ("PFO"), a newly created subsidiary of SL Green Realty Corporation ("SL Green"). The transfer was for zero dollars.

Alleging that this constituted a fraudulent transfer, the plaintiff brought this action seeking to recover the judgment debt owed by PM2 to the plaintiff. The plaintiff seeks relief against SL Green and the following five entities that are alleged to be alter egos of SL Green: PFO, 245 Park Member LLC ("245 Park"), Palisades Member 1 LLC ("PM1"), PM2, and PTC (collectively, the "SL Green Subs").

1

The plaintiff also brings claims against Andrew S. Levine and Harrison Sitomer, who are officers of SL Green as well as each of the SL Green Subs (together, the "Individual Defendants"). The plaintiff alleges that the Individual Defendants breached fiduciary duties owed to PM2 when Levine effectuated, and Sitomer allowed, the transfer of the PPC Center for zero dollars.

The defendants now move to dismiss the First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I. Factual Background

Unless otherwise noted, the following facts are taken from the First Amended Complaint ("FAC"), ECF No. 40, and are accepted as true for purposes of the present motion to dismiss.[1]

### A. The Parties

The plaintiff Bravia is a Hong Kong corporation with its principal place of business in Hong Kong. FAC ¶ 1. The defendant SL Green is a Maryland corporation with its principal place of business in New York City. Id. ¶ 2. The other corporate defendants, 245 Park, PM1, PM2, PTC, and PFO, are all limited

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

liability companies formed pursuant to Delaware law with offices at "c/o SL Green" in New York City. Id. ¶¶ 3-7.[2]

SL Green's ownership structure of the SL Green Subs is at the heart of this case. As of July 12, 2023, SL Green owned 245 Park, 245 Park owned PM1, PM1 owned PM2, PM2 owned PTC, and PTC owned the PPC Center. Id. ¶¶ 14-17, 49-51. At all relevant times, 245 Park's subsidiaries in the "PM ownership silo," namely, PM1, PM2, and PTC, owned only one significant asset: the PPC Center. See id. ¶¶ 51, 68, 70. On September 22, 2023, SL Green formed PFO outside of the PM ownership silo. See id. ¶¶ 94-96. Since PFO's formation, SL Green has owned PFO. Id.

Bravia illustrates the relevant corporate structure with the following diagram:

---

[2] This action was brought on March 27, 2024. ECF No. 1. As of that date, for diversity-of-citizenship purposes: Bravia was a citizen of Hong Kong; SL Green was a citizen of Maryland and New York; and 245 Park, PM1, PM2, PTC, and PFO were citizens of eight states of the United States of America. ECF No. 47; 28 U.S.C. § 1332(c)(1); Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51-52 (2d Cir. 2000). Additionally, Levine and Sitomer were United States citizens domiciled in New York. See ECF Nos. 47, 48; Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998).



Id. ¶ 19.

The defendant Andrew S. Levine is SL Green's General

Counsel, Executive Vice President, Corporate Secretary, and

Chief Legal Officer. Id. ¶¶ 9, 90-91, 103. The defendant Harrison Sitomer is SL Green's Chief Investment Officer ("CIO"). Id. ¶¶ 10, 81, 92-93. Both Levine and Sitomer are also officers of each SL Green Sub. Id. ¶¶ 67, 90-93. Levine and Sitomer held their above-listed roles at all relevant times. See id. ¶¶ 90-93.

## B. Debt Collection Efforts

Bravia and 245 Park are former business partners of HNA Group, a Chinese conglomerate that collapsed in 2021. See FAC ¶¶ 21, 25, 46. This case arose when Bravia and 245 Park's respective debt collection efforts against entities associated with HNA Group brought Bravia into conflict with 245 Park and its corporate parent, SL Green. See generally id. Namely, Bravia and the defendants dispute whether it was proper for PTC, SL Green's indirect subsidiary, to transfer the PPC Center, real property located in Orangetown, New York, to PFO, a newly formed SL Green subsidiary existing outside the PM ownership silo. See id. ¶¶ 50-51.

### 1. Bravia's Collection Efforts

On August 20, 2019, in settlement of amounts owed to Bravia for services rendered, Bravia entered into a Payment and Indemnity Agreement and Unconditional Guarantee (the "Agreement & Guarantee") with HNA Group Co., Limited ("HNA Ltd.") and PM2, then a wholly owned indirect subsidiary of HNA Ltd. Id. ¶¶ 22-

5

24. Pursuant to the Agreement & Guarantee, PM2 agreed to "absolutely, unconditionally, and irrevocably" guarantee a $10 million payment owed by HNA Ltd. to Bravia (the "Upstream Guaranty"); that payment obligation was triggered in the event HNA Ltd. sold Ingram Micro Inc. ("IMI"), then an indirect subsidiary of HNA Ltd. Id. ¶ 24.

On April 8, 2021, after Bravia discovered that HNA Ltd. was in breach of its obligations under the Agreement & Guarantee, Bravia filed an action in the New York State Supreme Court, New York County, against HNA Ltd. and PM2 (the "state-court action"). Id. ¶ 26. On July 2, 2021, HNA Ltd. sold IMI for approximately $7.2 billion. Id. ¶ 27. Following that sale, HNA Ltd. and PM2 neglected to pay Bravia, in violation of the Agreement & Guarantee. Id. ¶¶ 28-29.

On October 7, 2021, in the state-court action, Bravia moved for a prejudgment order of attachment of the assets then-owned by HNA Ltd. and PM2. Meister Decl. Ex. B, ECF No. 42-2. On December 14, 2021, finding that Bravia "ha[d] failed to proffer sufficient evidence of the requisite intent to defraud on the part of [PM2]," the state court denied the motion. Id. at 9.

On January 31, 2023, because HNA Ltd. stopped participating in the state-court action, a default judgment was entered against HNA Ltd. FAC ¶ 36. On March 24, 2023, alleging that PTC is an alter ego of PM2, Bravia moved again for a prejudgment

6

order of attachment, this time seeking attachment of assets owned by PTC. Meister Decl. Ex. C, ECF No. 42-3. The state court again denied a prejudgment order of attachment that would have prohibited the transfer or sale of the PPC Center. Id. at 34-35.

On March 29, 2023, Bravia moved for summary judgment against PM2. FAC ¶ 37. After numerous delays allegedly caused by HNA Ltd. and PM2 (since July 12, 2023, owned indirectly by SL Green), on December 1, 2023, the state court granted Bravia's motion for summary judgment against PM2. Id. ¶¶ 30-44, 61-66, 72. On January 10, 2024, final judgment in the amount of $12,986.660.70 in favor of Bravia was entered against PM2. Id. ¶¶ 72-73. That $12,986.660.70 judgment against PM2 remains unpaid (the "Judgment Debt"). Id. ¶¶ 74-75.

### 2. 245 Park's Collection Efforts

245 Park's legal proceedings against HNA Group began later but ended earlier than Bravia's. On April 30, 2022, an arbitrator issued an arbitration award of $185,412,763.60 in favor of 245 Park and against HNA Group International Co., Limited ("HNA Int'l"). 245 Park Member LLC v. HNA Grp. (Int'l) Co., 674 F. Supp. 3d 28, 33 (S.D.N.Y. 2023). On July 25, 2022, this Court confirmed that arbitration award. Id. at 31. On July 27, 2022, the Clerk of Court entered judgment. Id.

On May 19, 2023, during 245 Park's judgment-recovery efforts against HNA Int'l, this Court granted 245 Park's

7

turnover motion and ordered HNA Int'l "to turn over its 100% membership interest in [PM1] directly to 245 Park" (the "Turnover Order"). Id. at 42. HNA Int'l appealed, and the Second Circuit Court of Appeals administratively stayed the Turnover Order. FAC ¶ 47. On July 11, 2023, that administrative stay was vacated. Id. ¶ 53. The next day, on July 12, 2023, PM1 was turned over to 245 Park. Id. ¶ 54.

The turnover of PM1 to 245 Park posed a problem for Bravia because, when the Turnover Order issued, PM1 directly owned PM2, and PM2 indirectly owned the PPC Center. See id. ¶¶ 48-52, 55-58. In Bravia's view, because the PPC Center was PM1's only significant asset, 245 Park's main objective in procuring PM1 was to obtain the sale proceeds of the PPC Center. Id. ¶¶ 49-52, 152-53. But because the PPC Center was also PM2's only significant asset, any such sale proceeds were the only res against which Bravia could recover its Judgment Debt against PM2. See id. ¶¶ 51, 55-60, 68-70, 76.

Aware of this risk, on June 8, 2023, several weeks after the Turnover Order issued, Bravia advised counsel for 245 Park about PM2's Judgment Debt owed to Bravia. Id. ¶ 48; see also id. ¶¶ 149-51. Bravia also demanded that 245 Park turn over to Bravia any assets held directly or indirectly by PM2. Id. ¶¶ 48-49. On July 13, 2023, and again on August 2, 2023, Bravia

contacted counsel for 245 Park. Id. ¶¶ 55–56. 245 Park did not respond. Id. ¶ 57.

Meanwhile, before the Second Circuit Court of Appeals, counsel for 245 Park acknowledged that PM1 was "many corporate layers" removed from the PPC Center, and that the "numerous intermediate holding companies," including PM2, "may have been subject to liabilities." Id. ¶ 58. 245 Park argued, however, that 245 Park was "absolutely entitled to do what it wants with [PM1] or its assets." Id. ¶ 59. When describing 245 Park at oral argument, counsel for 245 Park said that 245 Park "is essentially SL Green." Id. ¶ 60. On April 8, 2024, the court of appeals affirmed the Turnover Order. 245 Park Member LLC v. HNA Grp. (Int'l) Co. Ltd., No. 23-842-cv, 2024 WL 1506798 (2d Cir. Apr. 8, 2024) (summary order).

### C. PTC's Transfer

On October 31, 2023, about five months after PM1 was turned over to 245 Park, and while Bravia's summary judgment motion against PM2 was pending in state court, PTC transferred its entire interest in the PPC Center to PFO, SL Green's newly created subsidiary (the "transfer"). Id. ¶ 67. The transfer was for zero dollars, and allegedly for no consideration. Id. ¶ 71. According to Bravia, the transfer rendered PTC insolvent. Id. ¶ 68; see also N.Y. Debt. & Cred. Law § 271(a) ("A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts

is greater than the sum of the debtor's assets."). Bravia also alleges that PM2 was solvent before the transfer, but that following the transfer, PM2 held no assets of value. FAC ¶¶ 69-70. To date, PFO has retained the PPC Center. Id. ¶ 148.

The warranty deed that transferred the PPC Center was executed on behalf of PTC by "Andrew S. Levine," in his capacity as "Executive Vice President" of PTC. Id. ¶¶ 103-04; id. Ex. 28 at *4, ECF No. 40-28. The warranty deed was recorded along with the corresponding state "Real Property Transfer Report" ("RPT Report"). Id. ¶ 106.

Bravia contends that the RPT Report contained many red flags. Namely, the report:

- Was signed by Levine on behalf of both the "Buyer" (PFO) and the "Seller" (PTC);
- Listed the PPC Center's "Full Sale Price" as "0.00" but the property's "Total Assessed Value" as "12,400,000," where, nine months before the transfer, PTC had negotiated a draft agreement to sell the PPC Center for $33,000,000.00;
- Stated that the transfer was a "Sale between Related Companies or Partners in Business;"
- Listed "c/o SL Green Realty Corp." as PFO's "Tax Billing Address," and listed Levine and "c/o SL Green Realty Corp." as PFO's contact; and
- Listed as PFO's attorney, "Gary Kleinman," the lawyer that leads SL Green's outside counsel teams.

Id. ¶¶ 105-14; Ex. 28 at 13; Ex. 44, ECF No. 40-44.

With respect to Sitomer, Bravia alleges that Sitomer knew about but did not stop or attempt to stop the allegedly fraudulent transfer of the PPC Center from PTC to PFO. Id. ¶¶

10

97-100. In the state-court action, Sitomer also certified information subpoena responses to Bravia as the "authorized representative of" each of 245 Park, PM1, PM2, and PTC. See id. ¶¶ 97-98, Exs. 27, 29, 40, 41, ECF Nos. 40-27, 40-29, 40-40, 40-41.

### D. PTC's Loan Debt

Additionally, Bravia alleges that, once or twice a month from an unspecified time until February 2023, PM2 loaned money to PTC for PTC's operations and other business needs. See id. ¶¶ 118-19, 123-25. According to Bravia, PTC owes PM2 $1,736,660.12 in loaned funds (the "Loan Debt"). Id. ¶¶ 121-26. No written loan agreements or promissory notes governed the Loan Debt. Id. ¶ 120. The Loan Debt was not subject to interest. Id. The Loan Debt is allegedly due and owing. Id. ¶ 126.

### E. Alter-Ego Allegations

Bravia alleges that SL Green exercises exclusive domination and control over the SL Green Subs, stripping the SL Green Subs of any legal or independent significance. Id. ¶ 137.

As evidence, Bravia alleges that each SL Green Sub:

- Maintains its office with SL Green and mingles records with SL Green's records;
- Is not adequately capitalized and, except PFO, is insolvent;
- Has no bank account;
- Does not have properly functioning officers and directors;
- Does not observe corporate formalities;

11

- Functions simply as a façade for SL Green;
- Has not performed any due diligence;
- Has no independent discretion in interacting with SL Green;
- Has had its assets siphoned by SL Green; and
- Acts contrary to its own interests for the benefit of SL Green.

Id. ¶¶ 82–87, 138–47, 154. Bravia further alleges that each officer of each SL Green Sub also holds the office of senior vice president or higher at SL Green. Id. ¶¶ 77, 89. Additionally, the same outside counsel represented the SL Green Subs in the state-court action. Id. ¶ 97.[3]

Bravia alleges the following about PM2 only:

- Officers of PM2 must adequately promote the interests of PM2;
- PM2 has not disclosed any directors and has no board of directors;
- PM2 has identified Scott Kocis (an SL Green employee), Harrison Sitomer, and PM1 as persons having information concerning PM2's assets; and
- PM2 has no source of income or receipts and has not paid dividends.

Id. ¶¶ 78–85.

### F. Procedural History

On March 27, 2024, Bravia brought this action. ECF No. 1. On June 28, 2024, Bravia filed the FAC. ECF No. 40. The defendants now move to dismiss the FAC for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of

---

[3] The same outside counsel represents the defendants in this action.

Civil Procedure. ECF No. 41. On February 11, 2025, the Court heard oral argument on the defendants' motion.

## II. Legal Standard

### A. Rule 12(b)(1)

To prevail against a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept as true the material factual allegations in the complaint. See J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiff's favor. Id. Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings to determine whether jurisdiction exists. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by the decisional law that has developed under Rule 56. See id.

### B. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d

13

184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### III. Enforcement of a State-Court Judgment

In Counts 2 through 7, Bravia attempts to collect the Judgment Debt by using New York Civil Practice Law & Rules ("CPLR") § 5225, § 5227, or both. Id. ¶¶ 160-206. Containing §§ 5225 and 5227, Article 52 of the CPLR concerns the enforcement of money judgments. N.Y. C.P.L.R. §§ 5201-53. Invoking diversity-of-citizenship jurisdiction, Bravia contends that §§ 5225 and 5227 provide substantive causes of action. See ECF Nos. 52, 54, 56, 58.

"Since 1948, federal courts have been directed by" the Full Faith and Credit Act (the "FFC Act"), 28 U.S.C. § 1738, "to accord state court judgments full faith and credit." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez., 863 F.3d 96, 122 (2d Cir. 2017). The FFC Act, however, "has no bearing on the question of whether a district court has subject matter jurisdiction to hear a claim." Vera v. Republic of Cuba, 867 F.3d 310, 320 (2d Cir. 2017); see also Anglo-Am. Provision Co. v. Davis Provision Co., 191 U.S. 373, 374 (1903). And the FFC Act "does not give rise to an implied federal cause of action." See Thompson v. Thompson, 484 U.S. 174, 182-83 (1988). Moreover, federal courts are not empowered to domesticate or register state-court judgments. Mobil Cerro Negro, 863 F.3d at 122-23; W.S. Frey Co. v. Precipitation Assocs. of Am., Inc., 899 F. Supp. 1527, 1528 (W.D. Va. 1995).

15

Therefore, "[t]he proper avenue to enforce a state court judgment in federal court is to bring a claim under state law of which the federal court has an independent source of jurisdiction, such as diversity of citizenship jurisdiction." Pereira v. N.Y.C. Dep't of Just., No. 24-cv-5320, 2024 WL 4953959, at *3 (S.D.N.Y. Dec. 2, 2024) (collecting cases), appeal docketed, No. 24-3239 (2d Cir. Dec. 13, 2024); Ingevity Corp. v. Regent Tek Indus., Inc., No. 22-cv-565, 2022 WL 18859010, at *5 (E.D.N.Y. Nov. 23, 2022), report and recommendation adopted, 2023 WL 2553896 (E.D.N.Y. Mar. 17, 2023); Caruso v. Perlow, 440 F. Supp. 2d 117, 119 (D. Conn. 2006). In this case, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. See ECF No. 52.[4]

That, "however, does not end the threshold inquiry of whether the case is properly" brought; "a plaintiff must also state a claim upon which relief may be granted." Shakur v.

---

[4] The defendants argue that this case should be dismissed because enforcement proceedings are ancillary to the state-court action from which the judgment issued. See ECF No. 53, 59; Multibank, Inc. v. Access Glob. Cap. LLC, No. 17-cv-3467, 2017 WL 6028535, at *8 (S.D.N.Y. Dec. 4, 2017); High Speed Cap. LLC v. Corp. Debt Advisors, LLC, 339 F. Supp. 3d 137, 140-43 (W.D.N.Y. 2018). The ancillary-proceeding doctrine, however, is a "prudential doctrine" based on the text of the removal statute, 28 U.S.C. § 1441, that "seeks to avoid the waste of having federal courts 'entertain satellite elements of pending state suits and judgments.'" Travelers Prop. Cas. v. Good, 689 F.3d 714, 724 (7th Cir. 2012) (quoting Armistead v. C & M Transp., Inc., 49 F.3d 43, 46 (1st Cir. 1995)); Jackson-Platts v. Gen. Elec. Cap. Corp., 727 F.3d 1127, 1134 (11th Cir. 2013). Because this is not a removed action, the defendants' argument fails.

_Milusnic_, No. 18-cv-628, 2019 WL 3207821, at *1 (C.D. Cal. Mar. 7, 2019). Bravia brings Counts 2 through 7 solely pursuant to judgment-enforcement provisions contained in CPLR Article 52: §§ 5225 and 5227. Under New York law, however, "procedural mechanism[s] by which judgment creditors can enforce a money judgment" do not provide "substantive right[s]." See _Mitchell v. Garrison Protective Servs., Inc._, 819 F.3d 636, 640 (2d Cir. 2016) (emphases in original); _CSX Transp., Inc. v. Island Rail Terminal, Inc._, 879 F.3d 462, 468-69 (2d Cir. 2018). Accordingly, Bravia cannot presently invoke CPLR §§ 5225 and 5227.[5]

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." _Gasperini v. Ctr. for Humans., Inc._, 518 U.S. 415, 427 (1996). In federal court, the operative judgment-enforcement procedure is Rule 69(a) of the Federal Rules of Civil Procedure. See _id._ at 427 n.7; _Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co._, 559 U.S. 393, 398 (2010). But because federal courts are not empowered to domesticate or register state-court judgments, _Mobil Cerro_

---

[5] In opposition, Bravia relies on _TD Bank, N.A. v. Coppolino_, where the court found that CPLR §§ 5225 and 5227 provided substantive "rights . . . under New York law." See No. 9-cv-3721, 2010 WL 11626968, at *8-9 (E.D.N.Y. Sept. 30, 2010), _report and recommendation adopted_, Case No. 9-cv-3721, ECF No. 49 (E.D.N.Y. Oct. 26, 2010). _TD Bank_ is unpersuasive because it was decided before the Second Circuit Court of Appeals clarified that CPLR §§ 5225 and 5227 are merely judgment-enforcement procedures. See _Mitchell_, 819 F.3d at 640; _CSX Transp._, 879 F.3d at 468-69.

Negro, 863 F.3d at 122–23, Rule 69(a) may not "be invoked in aid
of a [s]tate [c]ourt judgment." United States v. Potter, 19
F.R.D. 89, 89 (S.D.N.Y. 1956); see also U.S.I. Props. v. M.D.
Constr. Co., 230 F.3d 489, 498 n.8 ("The incorporation of state
enforcement procedures through Rule 69 is not alone sufficient
to create federal jurisdiction over such enforcement
proceedings.") (emphasis in original). Therefore, to invoke
properly Rule 69(a), Bravia must first obtain a federal-court
judgment. See Caruso, 440 F. Supp. 2d at 119; Villoldo v.
Republic of Cuba, 659 F. Supp. 3d 1158, 1187 (D. Colo. 2023);
Kirshner v. Smith, No. 23-cv-397, 2024 WL 3640619, at *7 (D. Vt.
July 10, 2024), report and recommendation adopted, 2024 WL
3638901 (D. Vt. Aug. 2, 2024).[6]

Because Bravia may not invoke state enforcement procedures
in federal court as substantive causes of action, Gasperini, 518
U.S. at 427; Mitchell, 819 F.3d at 640, this Court has no
jurisdiction to consider Counts 2 through 7. See Caruso, 440 F.
Supp. 2d at 119. Therefore, Counts 2, 3, 4, 5, 6, and 7 are
**dismissed without prejudice** for lack of subject-matter
jurisdiction. Fed. R. Civ. P. 12(h)(3).

---

[6] "In the federal courts, a judgment of a state court may be sued on as a
cause of action in a federal court having jurisdiction." Cont'l Cas. Co. v.
Argentine Republic, 893 F. Supp. 2d 747, 753 (E.D. Va. 2012); Caruso, 440 F.
Supp. 2d at 119. Bravia, however, has neither alleged nor invoked any such
claim on the state-court judgment as a cause of action.

### IV. Fraudulent Transfer Claim

In Count 1, Bravia contends that PTC fraudulently transferred the PPC Center to PFO, in violation of the New York Debtor and Creditor Law ("DCL"), and because SL Green and the SL Green Subs are alter egos of each other, Bravia's debt can be collected from all of them. FAC ¶¶ 128-59. Bravia also relies on CPLR §§ 5225 and 5227 to collect the Judgment Debt from the defendants. Id. In addition, Count 1 charges the defendants with forming a conspiracy to fraudulently transfer the PPC Center, in violation of New York law. Id.

Pursuant to the DCL, judgment creditors may bring a plenary action to set aside an allegedly fraudulent conveyance. See Red Rock Sourcing LLC v. JGX LLC, No. 21-cv-1054, 2024 WL 1243325, at *39-40 & *39 n.18 (S.D.N.Y. Mar. 22, 2024); Great Atl. & Pac. Tea Co. v. 380 Yorktown Food Corp., No. 16-cv-5250; 2020 WL 4432065, at *23 (S.D.N.Y. July 31, 2020). Moreover, under the DCL, judgment creditors may sue nonparties to the underlying action even where "the parties assume[] that [CPLR Article 52] provided the procedural basis for the suit." See Mitchell, 819 F.3d at 640. In other words, the DCL provides substantive causes of action that Bravia may pursue in this federal diversity action because Bravia has invoked the DCL "early in this litigation," giving the defendants "sufficient notice . . . to

defend against arguments relevant to a plenary action." See id. at 641 n.5.

Bravia alleges that the defendants fraudulently conveyed the PPC Center in violation of DCL §§ 273, 274, 275, 276, & 276-a. FAC ¶¶ 128–59. Bravia therefore brings its claim pursuant to the two principal operative sections: §§ 273(a) and 274. The two sections are set forth in the following footnote.[7]

---

[7] Section 273(a) provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (i) was engaged in or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.Y. Debt. & Cred. Law § 273(a). In short, § 273(a)(1) provides present and future creditors with a right of action to set aside actual fraudulent transfers, and § 273(a)(2) does the same for constructively fraudulent transfers.

> Section 274 provides, in relevant part:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

> (b) A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Effective April 4, 2020, the DCL was amended to adopt the Uniform Voidable Transactions Act. "After April 4, 2020, what were once § 276 and § 273, capturing actual and constructive fraudulent conveyance, have now become § 273(a)(1) and § 273(a)(2), respectively." Espire Ads LLC v. TAPP Influencers Corp., 655 F. Supp. 3d 223, 268 (S.D.N.Y. 2023). Because PTC transferred its entire interest in the PPC Center to PFO in October 2023, the amended DCL applies to the transfer.

Under both the former and present versions of the DCL, different pleading standards apply to different fraudulent-transfer claims. Red Rock Sourcing, 2024 WL 1243325, at *40 (holding that claims under the amended § 273(a)(1) are "subject to Rule 9(b)'s heightened pleading standards"). However, the defendants do not argue that Count 1 fails because of any applicable heightened pleading standard. The defendants' arguments for dismissal are addressed in turn.

### A. Creditor Status under the DCL

The defendants argue that Bravia's fraudulent-transfer claim should be dismissed because the DCL permits only a direct creditor of the transferor to attack a real-estate conveyance as fraudulent. Defs' Mem. of Law ("Br.") 8-9, ECF No. 43; Reply

---

N.Y. Debt. & Cred. Law § 274. In short, § 274 provides only "present creditors" with rights of action to set aside "constructively fraudulent transfers." See Red Rock Sourcing, 2024 WL 1243325, at *40.

Mem. of Law ("Rep.") 2–5, ECF No. 45.[8] Bravia disagrees, arguing
that it can invoke the DCL's causes of action because the SL
Green Subs, including PM2 and PTC, are alleged to be alter egos
of SL Green. Mem. of Law in Opp. ("Opp.") 7–14, ECF No. 43.[9]

As a threshold matter, "a federal court exercising
diversity jurisdiction must apply the choice-of-law rules of the
state in which that court sits." Liberty Synergistics Inc. v.
Microflo Ltd., 718 F.3d 138, 151 (2d Cir. 2013). "Under New York
choice of law rules, where both parties agree as to the
applicable law, that agreement is sufficient to establish choice
of law." Excelsior Cap. LLC v. Allen, No. 11-cv-7373, 2012 WL
4471262, at *9 (S.D.N.Y. Sept. 26, 2012), aff'd, 536 F. App'x 58
(2d Cir. Sept. 6, 2013) (summary order). Impliedly in briefing,
then expressly at oral argument, the parties agreed that
Bravia's claim is governed by New York fraudulent-conveyance law

---

[8] Although the defendants argue that Bravia lacks "standing," their argument
is not that Bravia lacks constitutional standing under Article III. Rather,
the defendants argue that Bravia does not qualify as a "creditor" entitled to
recover under the DCL. "[W]hether the particular plaintiff 'has a cause of
action under the statute' . . . 'does not implicate subject-matter
jurisdiction.'" See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821
F.3d 352, 359 (2d Cir. 2016) (quoting Lexmark Int'l, Inc. v. Static Control
Components, Inc., 572 U.S. 118, 127–28 & n.4 (2014)); see also Commerzbank AG
v. U.S. Bank, N.A., 100 F.4th 362, 383 n.30 (2d Cir. 2024) (applying the
Lexmark principle to state-law claims).
[9] Bravia has clarified that "[t]he FAC does not plead alter-ego liability
against Levine and Sitomer." Opp. 16.

and Delaware veil-piercing law. Br. 8–12; Rep. 2–7; Opp. 7–14.[10] The Court therefore "follow[s] their lead." See Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).

### 1. Statutory Interpretation

The first question presented is a straightforward question of statutory interpretation: Do the causes of action provided in DCL §§ 273(a) and 274 extend to plaintiffs like Bravia? The short answer is yes.

Under the DCL, "only creditors" may "set aside fraudulent transactions." Eberhard v. Marcu, 530 F.3d 122, 130–31 (2d Cir. 2008) (addressing the former DCL). This is because both § 273(a) and § 274 provide that, where certain conditions are met, a transfer made "by a debtor is voidable as to a creditor." N.Y. Debt. & Cred. Law §§ 273(a) & 274 (emphases added). Thus, "even if a transfer is made with actual intent to defraud creditors, one must be a creditor in order to complain." Martes v. USLIFE Corp., 927 F. Supp. 146, 148 (S.D.N.Y. 1996) (addressing the former DCL).

---

[10] SL Green is a Maryland corporation. FAC ¶ 2. Although Maryland courts are "more restrictive than other jurisdictions" in permitting veil-piercing, Horlick v. Cap. Women's Care, LLC, 896 F. Supp. 2d 378, 395 (D. Md. 2011), Maryland law permits courts to disregard a corporate entity "when necessary to prevent fraud or to enforce a paramount equity." Schlossberg v. Bell Builders Remodeling, Inc., 109 A.3d 1146 (Mem) (Md. 2015). In any event, the defendants concede that, for relevant purposes, Delaware, Maryland, "and New York[] have the same standard for the pleading of a veil piercing claim." Br. 11.

However, the DCL permits creditors to sue when the debtor's alter ego fraudulently transfers property. JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366, 380 (S.D.N.Y. 2003) ("JSC"); City of Almaty v. Ablyazov, 278 F. Supp. 3d 776, 798 (S.D.N.Y. 2017); SungChang Interfashion Co. v. Stone Mountain Accessories, Inc., No. 12-cv-7280, 2013 WL 5366373, at *11–12 (S.D.N.Y. Sept. 25, 2013); UBS Secs. LLC v. Highland Cap. Mgmt., L.P., 940 N.Y.S.2d 74, 75 (App. Div. 2012). Put another way, where an entity is "adjudged to be the alter ego" of the debtor, that entity "stand[s] in the shoes of [the debtor] for purposes of the [DCL]." JSC, 295 F. Supp. 2d at 380. This is because if the nonparty to the original action "is adjudged to be the alter ego of [the judgment debtor], then [the nonparty] . . . would be considered to have been a defendant in the [original action] and subsequently to be a judgment debtor at the time that [the judgment debtor] was a defendant and judgment debtor." Id. at 380.

The defendants argue that, following the 2020 amendments, the DCL no longer provides creditors with causes of action when the debtor's alter egos make allegedly fraudulent transfers. Br. 8–9. But the amendments did not materially change the definition of "creditor." Compare § 270(c), (d) (2024) (defining "creditor" as "a person that has a claim") with § 270 (2019) (defining "creditor" as "a person having any claim"). Moreover, although

24

the former § 273 and former § 276 likewise limited their causes of action to only "creditors," §§ 273, 276 (2019); see also § 273-a (2019) (same only "as to the plaintiff"), in applying the former DCL, courts rejected the defendants' present argument, instead holding that alter egos could stand in the shoes of the debtor. See, e.g., JSC, 295 F. Supp. 2d at 380; UBS Secs., 940 N.Y.S.2d at 75. Therefore, the more persuasive interpretation of the present §§ 273(a) and 274 is that the debtor and its alter egos continue to be "treated as one entity" for purposes of the statute. JSC, 295 F. Supp. 2d at 380.

In sum, to plead creditor status under the DCL, Bravia must allege plausibly that, for purposes of the Judgment Debt, PTC (the transferor) is an alter ego of PM2 (the judgment debtor). See Eberhard, 530 F.3d at 131; JSC, 295 F. Supp. 2d at 380. Otherwise, there would be no "transfer made . . . by a debtor" that is "voidable as to a creditor" under the DCL. See N.Y. Debt & Cred. Law §§ 273(a), 274 (emphases added). With sufficient alter-ego allegations, at the pleadings stage, PTC "would stand in the shoes of" the debtor, PM2, "for purposes of the [DCL]."

See JSC 295 F. Supp. 2d at 380; N.Y. Debt. & Cred. Law § 270(f) (defining "debtor" as "a person that is liable on a claim").[11]

### 2. Piercing the Corporate Veil

To plead creditor status under the DCL, Bravia must allege plausibly that PTC is PM2's alter ego. Arguing for dismissal, the defendants contend that Bravia's alter-ego allegations are conclusory. Br. 9–12; Rep. 5–7. The defendants also argue that Bravia fails to allege plausibly a fraud or injustice because HNA Ltd., not the defendants, "created the corporate structure" and the defendants merely "utilized that corporate structure to sell the property" in satisfaction of the antecedent debt owed to 245 Park after "the Turnover Order lawfully transferred" PM1 to 245 Park. Rep. 6–7. In response, Bravia argues that its alter-ego allegations are sufficient, emphasizing that SL Green created PFO about one month before the PPC Center was transferred for zero dollars. Opp. 11–14.

"[T]he general rule" is "that a parent has no property interest in the assets of a subsidiary." Spring Real Estate, LLC v. Echo/RT Holdings, LLC, No. 7994-VCN, 2016 WL 769586, at *3

---

[11] In opposing this result, the defendants rely on inapposite cases. For example, in Airball Cap. LLC v. Rosenthal & Rosenthal, Inc., the plaintiff did not "attempt to pierce the corporate veil." 155 N.Y.S.3d 61 (Table), at *6 (Sup. Ct. Nov. 10, 2021). Although one state trial court has opined that "[t]he fact that the defendants may be alter egos of one another . . . does not affect [the] plaintiffs' fraudulent conveyance claim," the case was reversed on appeal on other grounds and has never been followed. See Cornwall Mgmt. Ltd. v. Kambolin, 2014 WL 3899218 (N.Y. Sup.), at *1 (Sup. Ct. Aug. 4, 2014), rev'd on other grounds, 33 N.Y.S.3d 254 (App. Div. 2016).

(Del. Ch. Feb. 18, 2016). Thus, "[o]wnership of all of the outstanding stock of a corporation" is not equivalent to "ownership of the subsidiary's property or assets." In re Beck Indus., Inc., 479 F.2d 410, 415 (2d Cir. 1973); see also Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929) (Hand, J.). Hence, to overcome the separate corporate forms, a creditor of the parent must "pierc[e] the veil between [the] subsidiary and its parent." See In re Kwok, 663 B.R. 124, 140 (Bankr. D. Conn. 2023).

### (a) Sufficiency of Alter-Ego Allegations

In this case, Bravia does not seek to pierce directly PM2's corporate veil to reach PTC's assets based on conduct that occurred prior to the commencement of the state-court action. Thus, to demonstrate creditor status under the DCL, Bravia must pierce two corporate veils. See Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC, No. 2022-378, 2023 WL 5688392, at *4 (Del. Ch. Sept. 5, 2023). To reach SL Green, Bravia must pierce upward the corporate veil between PM2 and SL Green to hold the parent, SL Green, liable for the Judgment Debt. See Manichaean Cap., LLC v. Exela Techs., Inc., 251 A.3d 694, 706 (Del. Ch. 2021); see also In re Kwok, 663 B.R. at 144 (noting that "[f]or alter ego purposes, it is not necessary under Delaware law to break down the intermediate barriers presented by an indirect relationship"). To obtain liability from PTC, Bravia must pierce

27

downward the corporate veil between SL Green and PTC to hold the subsidiary, PTC, liable for the Judgment Debt. See <u>Manichaean Cap.</u>, 251 A.3d at 714.[12]

To plead a veil-piercing claim under Delaware law, although the "plaintiff need not prove that there was actual fraud," the plaintiff "must show [1] a mingling of the operations of the entity and its owner plus [2] an overall element of injustice or unfairness." <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 176 (2d Cir. 2008). On the first prong, courts consider factors such as: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." <u>Manichaean Cap.</u>, 251 A.3d at 706. On the second prong, "the corporate structure" itself must "cause fraud or similar injustice." <u>Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood</u>, 752 A.2d 1175, 1184 (Del. Ch. 1999).

With respect to each SL Green Sub and SL Green, Bravia has alleged plausibly "a mingling of the operations of the entity and its owner." <u>NetJets Aviation</u>, 537 F.3d at 176. First, Bravia

---

[12] To plead a plausible fraudulent-transfer claim, Bravia must also allege plausibly that PFO is a subsidiary alter ego of SL Green.

alleges that the "officers of each" SL Green Sub held positions of "senior vice president or higher" at "SL Green." Id. ¶¶ 77, 89, 97, 143. Second, Bravia has supported its general allegation that the SL Green Subs' "officers and directors do not function properly" with the nonconclusory allegation that PTC's officers transferred PTC's principal asset for zero dollars. Id. ¶¶ 97–114, 143. Additionally, Bravia asserts that each SL Green Sub maintains its office and mingles records with SL Green, has no bank account, exercises no independent discretion in interacting with SL Green, and is represented by the same outside counsel. Id. ¶¶ 82–83, 86–87, 97, 107. Accordingly, Bravia has alleged plausibly that SL Green exercised exclusive domination and control over the SL Green Subs.

Having satisfied the first prong, Bravia must also plead plausibly "an overall element of injustice or unfairness." NetJets Aviation, 537 F.3d at 176. Bravia has done so. With respect to SL Green, "[a]cts intended to leave a debtor judgment proof are sufficient to show fraud and injustice." Manichaean Cap., 251 A.3d at 708–09. By transferring the PPC Center out of PTC and into PFO, SL Green reduced to zero the value of PM2's principal asset: its 100% membership stake in PTC. FAC ¶¶ 68–71. Viewing the FAC in the light most favorable to Bravia, there is no question that SL Green "intended to leave" the "debtor [PM2] judgment proof." See Manichaean Cap., 251 A.3d at 708–09.

29

With respect to PTC, under Delaware law, outsider creditors like Bravia may state a claim to the debtor's subsidiary's assets "only in the most exceptional circumstances" to deter "owners of companies, particularly those that are closely held, from shuffling their assets among their controlled entities with the express purpose of avoiding a judgment." Id. at 714. To state such a claim successfully, the plaintiff must satisfy the two traditional veil-piercing elements. Id. In addition, on the second prong, the court must "focus on additional factors" to reach an equitable result. Id. at 715.[13]

---

[13] Such factors include the following:

> (1) the degree to which allowing a reverse pierce would impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct of the insider that gave rise to the reverse pierce claim, and the degree to which allowing a reverse pierce would establish a precedent troubling to shareholders generally; (2) the degree to which the corporate entity whose disregard is sought has exercised dominion and control over the insider who is subject to the claim by the party seeking a reverse pierce; (3) the degree to which the injury alleged by the person seeking a reverse pierce is related to the corporate entity's dominion and control of the insider, or to that person's reasonable reliance upon a lack of separate entity status between the insider and the corporate entity; (4) the degree to which the public convenience, as articulated by the Delaware General Corporation Law and Delaware's common law, would be served by allowing a reverse pierce; (5) the extent and severity of the wrongful conduct, if any, engaged in by the corporate entity whose disregard is sought by the insider; (6) the possibility that the person seeking the reverse pierce is himself guilty of wrongful conduct sufficient to bar him from obtaining equitable relief; (7) the extent to which the reverse pierce will harm innocent third-party creditors of the entity the plaintiff seeks to reach; and (8) the extent to which other claims or remedies are practically available to the creditor at law or in equity to recover the debt.

Manichaean Cap., 251 A.3d at 715 (the "Manichaean Capital factors").

Bravia alleges plausibly that SL Green exercised SL Green's complete domination over PTC to transfer the PPC Center for no consideration, with the ultimate goal of rendering PM2 judgment-proof. FAC ¶¶ 67–71; 103–14. Under Delaware law, "[s]pecific allegations of intentional acts aimed at avoiding judgments through the use of legal constructs are sufficient to" allege plausibly a fraud or injustice for veil-piercing purposes. Manichaean Cap., 251 A.3d at 717. Additionally, each of the eight Manichaean Capital factors favor allowing Bravia to pursue, past the pleadings stage, its alter-ego allegations against PTC. See id. at 717–19 (finding, in similar circumstances, that each factor favored permitting the claim to proceed). Therefore, Bravia has alleged plausibly that PTC is a subsidiary alter ego of SL Green.[14]

However, because the alleged injury justifying veil-piercing is the alleged devaluation of PM2's principal asset, PTC, "the reach of veil piercing liability here is limited accordingly." See Weihai Lianqiao Int'l Coop Grp. v. A Base IX Co. LLC, No. 21-cv-10753, 2023 WL 2989068, at *4 (S.D.N.Y. Apr. 18, 2023). Otherwise said, Bravia has alleged no facts that support piercing PM2's corporate veil directly to reach PTC's assets in satisfaction of the antecedent debt arising out of

---

[14] For the same reasons, Bravia has alleged plausibly that PFO is a subsidiary alter ego of SL Green.

PM2's breach of the Upstream Guaranty. See Manichaean Cap., 251 A.3d at 714-15.

In sum, Bravia has alleged plausibly that PM2, SL Green, and PTC are alter egos for purposes of the Judgment Debt. Accordingly, under the DCL, SL Green and PTC "stand in the shoes of [PM2]." See JSC, 295 F. Supp. 2d at 380. Bravia may therefore invoke the causes of action set forth in DCL §§ 273(a) and 274. See id. Whether Bravia's DCL claim ultimately succeeds "will depend upon proof that [PTC] was in fact an alter ego of [PM2] and thereby a defendant in the [state-court action] . . . at the time of the disputed conveyance[]." See id.

### (b) 245 Park's Antecedent Debt

Opposing Bravia's veil-piercing allegations and fraudulent-transfer claim, the defendants contend that the transfer was neither fraudulent nor unjust. Br. 9-10; Rep. 5-7. To justify the transfer, the defendants rely on the general rule that "a conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another." Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 599 N.Y.S.2d 816, 819 (App. Div. 1993) (citing the former DCL §§ 272 & 273). Following the 2020 amendments to the DCL, that general rule remains in force. See N.Y. Debt. & Cred. Law § 272(a) ("Value is given for a transfer . . . if, in exchange . .

32

. an antecedent debt is secured or satisfied . . . .”). Applying that general rule to 245 Park's antecedent debt, the defendants argue that SL Green was “within its rights” to transfer the PPC Center “in satisfaction of [245 Park's] debt.” Cf. Ultramar, 599 N.Y.S.2d at 819.

However, for purposes of determining “actual intent” under DCL § 273(a)(1), courts may consider factors such as whether: “the transfer or obligation was to an insider;” “the debtor retained possession or control of the property transferred after the transfer;” and “before the transfer was made . . . , the debtor had been sued or threatened with suit.” § 273(b).[15] For actual fraudulent transfers under DCL § 273(a)(1), the relevant intent is “the fraudulent intent of the transferor, not the transferee, to defraud creditors.” In re Nanobeak Biotech Inc., 656 B.R. 350, 362-63 (Bankr. S.D.N.Y. 2024) (emphasis in original).[16]

---

[15] In turn, the DCL defines “insider” to “include[],” where “the debtor is a corporation,” a “person in control of the debtor.” N.Y. Debt. & Cred. Law § 270(h)(2)(iii). Because Bravia alleges plausibly that PFO is SL Green's alter ego, Bravia also alleges plausibly that the transferee was “a person in control of the debtor.” See JSC, F. Supp. 2d at 380. In any event, the “use of the word ‘include’” shows that the list set forth in DCL § 270 is “illustrative rather than exhaustive.” Cf. Samantar v. Yousuf, 560 U.S. 305, 317 (2010); United States ex rel. Felten v. William Beaumont Hosp., 993 F.3d 428, 434, 434 n.4 (6th Cir. 2021).

[16] “[T]here is an open question regarding whether the intent of the transferee is relevant when determining whether the transfer was fraudulent under the N.Y. D.C.L.” In re 45 John Lofts, LLC, 650 B.R. 602, 612 n.12 (Bankr. S.D.N.Y. 2023). In this case, because Bravia alleges plausibly that PTC and PFO are both alter egos of SL Green, Bravia alleges plausibly actual fraudulent intent against both the transferor and the transferee.

Bravia has alleged plausibly such indicia of "actual intent to hinder, delay or defraud" a "creditor of the debtor." § 273(a)(1), (b). Bravia states that: (1) the transfer was from one insider to another, FAC ¶¶ 67-71; (2) SL Green retained control of the PPC Center, id. ¶ 148; and (3) the transfer occurred while Bravia's summary-judgment motion against PM2 was pending in state court, see id. ¶ 37, and after Bravia notified 245 Park of that claim, id. ¶¶ 48-49, 55-57, 149-51.

Moreover, DCL § 274(b) provides that "[a] transfer made by a debtor is voidable as to a [present] creditor" like Bravia "if [1] the transfer was made to an insider for an antecedent debt, [2] the debtor was insolvent at that time, and [3] the insider had reasonable cause to believe that the debtor was insolvent." Bravia has alleged plausibly all three elements of DCL § 274(b). FAC ¶¶ 48-49, 55-57, 67-71, 148-51.

In sum, Bravia's fraudulent-transfer allegations are sufficient to survive a motion to dismiss. See, e.g., Tian v. Top Food Trading Inc., No. 22-cv-345, 2024 WL 1051172, at *10-11 (E.D.N.Y. Feb. 26, 2024), report and recommendation adopted,

2024 WL 1908910 (E.D.N.Y. May 1, 2024); <u>Weihai Lianqiao</u>, 2023 WL 2989068, at *7.[17]

### 3. Parties Amenable to Suit

Under the DCL, Bravia may only bring a claim for money damages against PFO and SL Green. "It is well-settled that New York does not recognize a creditor's remedy for money damages against parties who were neither transferees of the assets nor beneficiaries of the conveyance." <u>SungChang Interfashion</u>, 2013 WL 5366373, at *7; <u>Stochastic Decisions, Inc. v. DiDomenico</u>, 995 F.2d 1158, 1172 (2d Cir. 1993) (citing <u>Fed. Deposit Ins. Co. v. Porco</u>, 552 N.E.2d 158, 159-60 (N.Y. 1990) (per curiam)). "Thus, the transferor of the property—that is, the debtor—is not the proper defendant in a fraudulent conveyance claim. Nor may a claim be brought against parties who merely participated in the transfer but did not benefit from it." <u>Amusement Indus., Inc. v. Midland Ave. Assocs., LLC</u>, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011). Moreover, "a money judgment may only be granted in lieu of setting aside the conveyance if the transferee has disposed of the wrongfully conveyed property in some manner which makes

---

[17] Past the pleadings stage, the defendants will have the opportunity to show that the transfer was not fraudulent, for example by showing that "the transfer satisfie[d] a secured obligation" owed to 245 Park. <u>See</u> <u>Korea Trade Ins. Corp. v. Neema Clothing, Ltd.</u>, No. 11-cv-8980, 2015 WL 363569, at *2 (S.D.N.Y. Jan. 28, 2015); <u>Englander Cap. Corp. v. Zises</u>, 79 N.Y.S.3d 502, 506 (Sup. Ct. 2018).

it impossible to return." City of Almaty v. Ablyazov, No. 15-cv-
5345, 2019 WL 4747654, at *4 (S.D.N.Y. Sept. 30, 2019).

Bravia brings its fraudulent-transfer claim under the DCL
against "all [d]efendants," seeking money damages and to set
aside the allegedly fraudulent transfer. FAC ¶¶ 128-59, 208(a),
(d). But it is plain that no such claim lies against the
Individual Defendants, the transferor (PTC), and the other
entities in the PM ownership silo (PM2, PM1, and 245 Park). Red
Rock Sourcing, 2024 WL 1243325, at *40. At most, Bravia alleges
that those parties "merely participated in the transfer but did
not benefit from it." Amusement Indus., 820 F. Supp. 2d at 527.

Thus, under the DCL, the only proper defendants are the
transferee, PFO, and SL Green, who is "alleged to have dominion
or control over th[e] [transferred] asset[] [and] to have
benefited" from the conveyance. See Porco, 552 N.E.2d at 160;
City of Almaty, 278 F. Supp. 3d at 798-99. As to the other
defendants, "there is no direct theory of liability for any
fraudulent conveyance claim." SungChang Interfashion, 2013 WL
5366373, at *11.

Bravia argues that "Count 1 is ultimately a judgment-
collection claim" where "[a]lter ego standing alone provides
another theory" of recovery. Opp. 13. But a judgment-collection
claim under the DCL properly lies against only SL Green and PFO.
Red Rock Sourcing, 2024 WL 1243325, at *40. Although veil-

piercing is necessary to demonstrate creditor status for purposes of the DCL, <u>see</u> <u>JSC</u>, 295 F. Supp. 2d at 380, piercing the corporate veil under Delaware law is "not a purely independent cause of action." <u>In re Tronox Inc.</u>, 549 B.R. 21, 44 (Bankr. S.D.N.Y. 2016). Rather, veil-piercing is a means of recovering an existing claim against an individual or entity who would otherwise be shielded by limited corporate liability. <u>See</u> <u>id.</u>; <u>In re Nordlicht</u>, 115 F.4th 90, 110 (2d Cir. 2024) (describing veil-piercing under New York law as "a demand for a remedy[] premised on facts that . . . establish a <u>right</u> to that remedy") (emphasis in original). Therefore, Bravia's DCL claim in Count 1 **survives** only against SL Green and PFO.[18]

### B. Co-Conspirator Liability

Bravia also contends that Count 1 alleges a plausible claim that the defendants conspired to fraudulently transfer the PPC Center in violation of New York law. Opp. at 14–15. The defendants respond that Bravia's conspiracy allegations fail because New York law does not permit a claim for naked conspiracy. Br. 12–13.

"New York does not recognize 'conspiracy' as an independent tort, but conspiracy allegations may be used to connect the

---

[18] Bravia requests jurisdictional discovery regarding the defendants' alleged alter-ego relationship. Opp. 14. Because Bravia's DCL claim survives against the proper defendants, Bravia's request for jurisdictional discovery is **denied as moot.**

actions of separate defendants with an otherwise actionable tort." SungChang Interfashion, 2013 WL 5366373, at *12. Where a plaintiff pleads an otherwise actionable tort, the plaintiff can connect co-conspirators to that tort by alleging "the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." Uni-World Cap., L.P. v. Preferred Fragrance, Inc., 43 F. Supp. 3d 236, 251 (S.D.N.Y. 2014). Fraudulent transfer "is a species of tort" that provides the necessary predicate for a claim of conspiracy. UFCW Loc. 174 Comm. Health Care Fund v. Homestead Meadows Foods Corp., No. 5-cv-7098, 2005 WL 2875313, at *2 (S.D.N.Y. Nov. 1, 2005).

In this case, the conspiracy allegations are pleaded as an alternative theory of liability under Count 1 for any defendants as to whom there is no direct liability under the DCL. FAC ¶ 155. Bravia alleges the elements of conspiracy in conclusory fashion. Id. For example, Bravia states that each defendant "committed overt acts in furtherance of" the defendants' alleged "agreement to fraudulently transfer the [PPC] Center (including execution of the deed transferring the [PPC] Center and the creation of [PFO])." Id. Unless supported by discrete allegations, such conclusory allegations are insufficient.

Iqbal, 556 U.S. at 678; Goldstein v. Siegel, 244 N.Y.S.2d 378, 382 (App. Div. 1963). But because "agreements in civil conspiracies will not easily be shown by direct evidence," such agreements "may be inferred from circumstantial evidence." Cofacredit S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 240 (2d Cir. 1999).

Bravia has failed to support in any way its conclusory allegation of conspiracy against PM1, 245 Park, and Sitomer. Therefore, Bravia's conspiracy allegations are insufficient to plead liability against them. See SungChang Interfashion, 2013 WL 5366373, at *13.

However, against PM2 and PTC, Bravia has stated a plausible claim that they conspired to fraudulently transfer the PPC Center in violation of the DCL. See Sungchang Interfashion, 2013 WL 5366373, at *13; UFCW Loc. 174, 2005 WL 2875313, at *3; see also Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981) (noting that conspiracy imputes the acts of one co-conspirator "to the others"). With respect to PM2, the judgment debtor, Bravia alleges that PM2 caused numerous delays in the state-court action. FAC ¶¶ 30-44, 61-66, 72. With respect to PTC, the original title owner of the PPC Center, Bravia alleges that PTC acted through its officers to transfer the PPC Center to PFO for zero dollars. Id. ¶¶ 67-68; 103-06. In this case,

such allegations provide sufficient circumstantial evidence to state a plausible claim for conspiracy against PM2 and PTC.

Bravia's claim for conspiracy to violate the DCL also survives against Andrew S. Levine. With respect to Levine, an officer of SL Green, PM2, PTC, and PFO, Bravia "alleges facts constituting a common agreement" to transfer the value of "[PM2]'s assets free of its liabilities to [PFO]," and Bravia's injury resulting "from the common agreement." See SungChang Interfashion, 2013 WL 5366373, at *13. Bravia also alleges that Levine intentionally participated in the alleged fraudulent plan by effectuating the transfer. See UFCW Loc. 174, 2005 WL 2875313, at *3. Namely, Levine signed the RPT Report on behalf of both the buyer (PFO) and the seller (PTC). FAC ¶¶ 105-06. Levine's alleged "active role in [effectuating] the transaction" for the benefit of his employer SL Green "demonstrate[s] his deliberate and vital role in the conspiracy." See Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986). Accordingly, Bravia's claim of conspiracy to commit fraudulent transfer alleged in Count 1 states a plausible claim against PM2, PTC, and Levine.

In sum, for the reasons explained above, the defendants' motion to dismiss Count 1 alleging violation of the DCL is **denied** as to defendants SL Green and PFO based on their direct liability under the DCL and **denied** as to the defendants PM2,

PTC, and Levine based on the claim of conspiracy to violate the DCL. Count 1 is **dismissed without prejudice** against PM1, 245 Park, and Sitomer.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted in part** and **denied in part** as discussed above. Count 1 **survives** against the defendants SL Green, PM2, PTC, PFO, and Andrew S. Levine, but is **dismissed without prejudice** against the remaining defendants. Counts 2, 3, 4, 5, 6 and 7 are **dismissed without prejudice** for lack of subject-matter jurisdiction. See Fed. R. Civ. P. 12(h)(3).

The plaintiff may file a second amended complaint by March 14, 2025. If the plaintiff does not file a second amended complaint by March 14, 2025, the time for the defendants SL Green, PM2, PTC, PFO, and Andrew S. Levine to answer the First Amended Complaint is March 28, 2025.

The parties are directed submit a Rule 26(f) report by March 14, 2025.

The Clerk is directed to close ECF No. 41.

SO ORDERED.

Dated:    New York, New York
          February 18, 2025

                                        _____
                                            John G. Koeltl
                                      United States District Judge